**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐) <br> TFC HOLDING COMPANY, TOMATOBANK, N.A. and TOMATO CARD SERVICES, INC. | **DEFENDANTS** <br> PRIMO CARD GROUP, LLC, JEFFREY ALLEN BAZAN A/K/A JEFF ALLEN A/K/A JEFFREY ALLEN PONCE A/K/A OSCAR YAMAL BAZAN A/K/A FNU LNU A/K/A TICO, et al. [SEE ATTACHMENT |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff (Except in U.S. Plaintiff Cases): <br> Los Angeles | County of Residence of First Listed Defendant (In U.S. Plaintiff Cases Only): <br> Los Angeles |
| **(c)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) <br> Brandon S. Reif (SBN 214706) and Rebecca E. Forman (SBN 211788) <br> Law Offices of Brandon S. Reif <br> 1801 Century Park East, Suite 2400 <br> Los Angeles, CA 90067; Tel: 310.836.4800; Fax: 310.836.4801 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☐ No    ☒ MONEY DEMANDED IN COMPLAINT: $ $355 million

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty <br> ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☒ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities /Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs <br> ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed? ☒ No  ☐ Yes

If yes, list case number(s): _____

**FOR OFFICE USE ONLY:**   Case Number: _____

CV08-00258

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**VIII(b). RELATED CASES:** Have any cases been previously filed that are related to the present case? ☑No   ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** List the California County, or State if other than California, in which **EACH** named plaintiff resides (Use an additional sheet if necessary)

☐ Check here if the U.S. government, its agencies or employees is a named plaintiff.

TFC HOLDING COMPANY is a Delaware corporation with its principal place of business in Los Angeles County.

TOMATOBANK, N.A. is a national bank with its principal place of business in Los Angeles County.

TOMATO CARD SERVICES, INC. is a Delaware corporation with its principal place of business in Los Angeles County.

List the California County, or State if other than California, in which **EACH** named defendant resides. (Use an additional sheet if necessary).

☐ Check here if the U.S. government, its agencies or employees is a named defendant.

PRIMO CARD GROUP, LLC is a California limited liability company with its principal place of business in Los Angeles County.

JEFF ALLEN A/K/A JEFFREY ALLEN PONCE A/K/A OSCAR YAMAL BAZAN A/K/A FNU LNU A/K/A TICO is an individual and resident in Los Angeles County.

OSCAR Y. BAZAN is an individual and resident in San Francisco County.

KAYHAN M. FATEMI is an individual and resident in Los Angeles County. (See Additional Sheet)

List the California County, or State if other than California, in which **EACH** claim arose. (Use an additional sheet if necessary)

**Note:** In land condemnation cases, use the location of the tract of land involved.

A substantial part of the events and omissions giving rise to the claims arose in Los Angeles County.

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____  Date _____ January 14, 2008 _____

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |

# ATTACHMENT TO CIVIL COVERSHEET

*TFC Holding  Company, et al. v. Primo Card Group, LLC, et al.*


## Defendants

PRIMO CARD GROUP, LLC, a California limited liability company;

JEFFREY ALLEN BAZAN A/K/A JEFF ALLEN A/K/A JEFFREY ALLEN PONCE A/K/A OSCAR YAMAL BAZAN A/K/A FNU LNU A/K/A TICO, an individual;

OSCAR Y. BAZAN, an individual;

KAYHAN M. FATEMI, an individual;

JESSE TORRES, an individual;

WEST COAST ANTI-MONEY LAUNDERING FORUM, a California corporation;

JAY MONTALVO, an individual;

JUDY P. VAN OORDT, an individual;

ROBERT VAN OORDT, an individual;

STEVEN SHUJI FUKUMOTO, an individual;

CELEB CARD GROUP LLC, a California limited liability company;

PREPAID PROVIDERS, LLC, a California limited liability company;

PREPAID DISTRIBUTORS, LLC, a California limited liability company;

FTF INVESTMENTS, LLC, a California limited liability company;

CARDONE PLUS, LTD., a Canadian corporation;

## ATTACHMENT TO CIVIL COVERSHEET

*TFC Holding Company, et al. v. Primo Card Group, LLC, et al.*

### Defendants (continued)

KEVIN LEWIS, an individual;

GLOBCASH, a Florida corporation;

GLOBAL PAYMENT, INC., a Florida corporation;

SAM ZORMATI, an individual;

EVOX MANAGEMENT, LLC, an Arizona limited liability company;

VICTOR FELICE, an individual;

MARIO FELICE, an individual;

TRILOGY, LTD., a Malta company;

PEAK XV LTD, a Malta company;

ALLIED WALLET INC., a Nevada corporation;

AHMAD KHAWAJA A/K/A ANDY KHAWAJA, an individual;

EZ DEBIT, a United Kingdom corporation;

ANIS GHUMAN, an individual;

SID SOHAIL, an individual;

CARDUSA, INC., a Florida corporation;

SHORELINE SOLUTIONS, LLC, a Connecticut limited liability company; and

DOES 1 through 300, inclusive.

FILED

Brandon S. Reif (SBN 214706)
     Email: brandon@reifattorneys.com
Rebecca E. Forman (SBN 211788)
     Email: rebecca@reifattorneys.com
**LAW OFFICES OF BRANDON S. REIF**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.836.4800
Facsimile: 310.836.4801

Donald P. Hateley (SBN 168890)
     Email: dhateley@hateleyhampton.com
**HATELEY & HAMPTON, APC**
1800 Century Park East, Sixth Floor
Los Angeles, CA 90067
Telephone: 310.576.4758
Facsimile: 310.388.5899

Attorneys for Plaintiffs
TFC HOLDING COMPANY,
TOMATOBANK, N.A. and
TOMATO CARD SERVICES, INC.

2008 JAN 16  AM 10: 04

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DISTRICT

| | |
|---|---|
| TFC HOLDING COMPANY, a Delaware corporation; TOMATOBANK, N.A., a national bank; and TOMATO CARD SERVICES, INC., a Delaware corporation, <br><br>            Plaintiffs, | Case No. CV08-0025 8  R(CWx) <br><br> COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES <br><br> DEMAND FOR JURY TRIAL |

1 |       vs.

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

PRIMO CARD GROUP, LLC, a
California limited liability
company; JEFFREY ALLEN
BAZAN A/K/A JEFF ALLEN
A/K/A JEFFREY ALLEN PONCE
A/K/A OSCAR YAMAL BAZAN
A/K/A FNU LNU A/K/A TICO, an
individual; OSCAR Y. BAZAN, an
individual; KAYHAN M. FATEMI,
an individual; JESSE TORRES, an
individual; WEST COAST ANTI-
MONEY LAUNDERING FORUM,
a California corporation; JAY
MONTALVO, an individual; JUDY
P. VAN OORDT, an individual;
ROBERT VAN OORDT, an
individual; STEVEN SHUJI
FUKUMOTO, an individual;
CELEB CARD GROUP LLC, a
California limited liability
company; PREPAID PROVIDERS,
LLC, a California limited liability
company; PREPAID
DISTRIBUTORS, LLC, a California
limited liability company; FTF
INVESTMENTS, LLC, a California
limited liability company;
CARDONE PLUS, LTD., a
Canadian corporation; KEVIN
LEWIS, an individual;
GLOBCASH, a Florida corporation;
GLOBAL PAYMENT, INC., a
Florida corporation; SAM
ZORMATI, an individual; EVOX
MANAGEMENT, LLC, an Arizona
limited liability company; VICTOR
FELICE, an individual; MARIO
FELICE, an individual; TRILOGY,

28

1   LTD., a Malta company; PEAK XV
2   LTD, a Malta company; ALLIED
    WALLET INC., a Nevada
3   corporation; AHMAD KHAWAJA
    A/K/A ANDY KHAWAJA, an
4   individual; EZ DEBIT, a United
5   Kingdom corporation; ANIS
    GHUMAN, an individual;  SID
6   SOHAIL, an individual;
7   CARDUSA, INC., a Florida
    corporation; SHORELINE
8   SOLUTIONS, LLC, a Connecticut
9   limited liability company; and
    DOES 1 through 300, inclusive,
10

11              Defendants.

12

13       Plaintiffs TFC Holding Company, TomatoBank, N.A. and Tomato Card
14
15   Services, Inc. (collectively, the "Bank" or the "Plaintiff") complain of the above-
16   named Defendants as follows:

17                      **SUMMARY OF THE ACTION**
18
19       1.     This is an action for declaratory relief and damages in excess of $355
20   million arising out of a fraudulent debit card scheme designed and operated by
21
22   Defendants Jesse Torres ("Torres"), Jeffrey Allen Bazan a/k/a Jeff Allen a/k/a
23   Jeffrey Allen Ponce a/k/a Oscar Yamal Bazan a/k/a Fnu Lnu a/k/a Tico
24   ("Bazan"), Oscar Bazan ("Oscar Bazan"), Kayhan Fatemi, Esquire ("Fatemi"), Jay
25
26   Montalvo ("Montalvo"), Primo Card Group, LLC ("Primo"), Celeb Card Group
27   LLC ("Celeb"), Steven Shuji Fukumoto ("Fukumoto"), Prepaid Providers,
28

LLC ("Prepaid"), Prepaid Distributors, LLC ("Prepaid Distributors"), FTF

Investments, LLC ("FTF"), Evox Management, LLC ("Evox"), Victor Felice

("Victor Felice"), Allied Wallet Inc. ("Allied Wallet"), Ahmad Khawaja

a/k/a Andy Khawaja ("Khawaja"), CardOne Plus, LTD. ("CardOne") and

Kevin Lewis ("Lewis), (collectively, Torres, Bazan, Fatemi, Montalvo, Primo,

Celeb, Fukumoto, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied

Wallet, Khawaja, CardOne and Lewis are the "Promoters"). The remaining

Defendants schemed, colluded, cooperated with and benefited from the Promoters'

fraudulent scheme, including Judy P. Van Oordt ("Mrs. Van Oordt"), Robert

Van Oordt ("Mr. Van Oordt"), GlobCash ("GlobCash"), Global Payment,

Inc. ("Global"), Sam Zormati ("Zormati"), Mario Felice ("Mario Felice"),

Trilogy LTD, ("Trilogy"), Peak XV LTD. ("Peak"), EZ Debit ("EZ Debit"),

Anis Ghuman ("Ghuman"), Sid Sohail ("Sohail") CardUSA, Inc.

("CardUSA"), Shoreline Solutions, LLC ("Shoreline") and Does 1 through

300, inclusive (collectively, Mr. Van Oordt, Mrs. Van Oordt, GlobCash,

Global, Zormati, Mario Felice, Trilogy, Peak, EZ Debit, Ghuman, Sohail,

CardUSA and Shoreline are the "ISO Defendants"). (The Promoters and the

ISO Defendants are referred to collectively as the "Defendants").

2.     At all times, the Promoters worked in concert to operate a deceptive

debit card marketing "program" through which non-resident, alien persons and

1    entities (the "Customers"), among other persons and entities, opened bank accounts

2    (the "Bank Accounts") with the Bank.  In some cases, Customers opened Bank

3

4    Accounts for legitimate banking transactions.  In other cases, however, the

5    Promoters caused Customers, including the ISO Defendants, to open Bank

6    Accounts intending to use, and in fact using, those Bank Accounts to secretly

7

8    transmit, dissipate, commingle and transfer money between accounts and from

9    place to place for illegal purposes, including, but not limited to, conversion,

10   embezzlement, money laundering, commingling funds, tax evasion, debit card

11

12   fraud, mail fraud, wire fraud, bank fraud and drug trafficking.

13           3.      At all times, the Bank believed not only that the Promoters were

14   implementing and administering the debit card programs properly, but that the only

15

16   "programs" in existence were in the "testing" phase.  The Promoters and the ISO

17   Defendants, however, established approximately dozens of programs, with an

18   unknown number of additional programs in negotiations, all without the Bank's

19

20   knowledge and approval.  The Promoters misrepresented to program providers,

21   Customers and the world at large that each program and potential program (the

22   "Unauthorized Programs") was underwritten and approved by the Bank.  The Bank

23

24   was totally unaware that its federal bank charter, intellectual property, good will,

25   service marks and general business reputation in the community were being abused

26   and misrepresented in connection with the Unauthorized Programs.

27

28

1        4.    The Defendants' fraudulent activities injured the Bank in several ways.

2    First, because the Promoters included several Bank employees, the Promoters were

3
4    able to manipulate and deceive the Bank Accounts for their own purposes, resulting

5    in losses for the Bank.  Second, because the Bank was totally unaware of the

6    Unauthorized Programs, the  Promoters and the ISO Defendants were able to divide
7
8    all profits therefrom, without sharing any with the Bank.  Third, because the

9    Defendants colluded with debit card providers like Shoreline and CardUSA to

10   provide goods and services at the purported request of the Bank, the Bank has been
11
12   receiving invoice payment demands for payment of goods and services it did not

13   authorize and never received.  And finally, because the Bank was being held out as

14   the financial institution backing the Unauthorized Programs, several of which were
15
16   in noncompliance with applicable federal regulations, other bodies with oversight

17   authority by law and by contract, the Bank was, and still is, exposed to an

18   extraordinary level of risk, as well as regulatory and legal liability, all totaling in
19
20   excess of $355 million.

21       5.    Defendants' actions have caused and continue to cause imminent,

22   irreparable harm to the Bank.  In addition to the direct financial harm to the Bank,
23
24   the Defendants' acts may be viewed by federal regulatory authorities – such as the

25   Office of the Comptroller of Currency ("OCC") and the United States Department

26   of Treasury, among others – as a violation of federal banking laws.  The
27
28

Defendants' acts may also be viewed by parties with certain contractual oversight over theh Bank – such as Visa USA Inc. ("Visa"), among others – as a violation of their policies and procedures. Envisioning the worst scenario, if the Bank had not uncovered the Unauthorized Programs when it did and take immediate corrective action to rid the Bank of the Defendants' interfacing with the Bank, and freeze the a certain of the Promoters' accounts at the Bank, the Defendants could have converted, embezzled and stole Bank assets, rendering the Bank subject to exposure in the hundreds of millions of dollars and effectively inoperable and worthless and ultimately stripping it of its federal charter.

6.    The Bank therefore seeks damages, compensatory relief and equitable relief to stop the Defendants from continuing the unlawful conduct and unfair business practices which are causing irreparable harm to the Bank. The Bank's damages claim is an amount not less than $355 million.

### PARTIES

7.    Plaintiff TFC Holding Company is a Delaware corporation with its principal place of business in the City of Industry, California.

8.    Plaintiff TomatoBank, N.A. is a federal bank with its principal place of business in the City of Industry, California.

9.    Plaintiff TomatoBank, N.A. is a federal bank with its principal place of business in the City of Industry, California.

1      10.     Plaintiff Tomato Card Services, Inc. is a Delaware corporation with

2   its principal place of business in the City of Industry, California.

3

4      11.     Primo Card Group, LLC is a California limited liability company

5   with its principal place of business in Manhattan Beach, California, at Bazan's

6   personal residence.

7

8      12.     Jeffrey Allen Bazan a/k/a Jeff Allen a/k/a Jeffrey Allen Ponce

9   a/k/a Oscar Yamal Bazan a/k/a Fnu Lnu a/k/a Tico is an individual and

10  resident of California, County of Los Angeles.

11

12     13.     Oscar Y. Bazan is an individual and resident of California, County of

13  San Francisco.

14

15     14.     Kayhan M. Fatemi is an individual and resident of California,

16  County of Los Angeles.  Fatemi is an attorney licensed to practice law in the State

17  of California.

18

19     15.     Jesse Torres is an individual and resident of California, County of

20  Los Angeles.

21     16.     West Coast Anti-Money Laundering Forum is a California

22  corporation with its principal place of business in Redondo Beach, California, at

23  Torres' personal residence.

24

25     17.     Jay Montalvo is an individual and resident of California, County of

26  Los Angeles.

27

28

- 8 -

18.     Judy P. Van Oordt is an individual and resident of California, County of Los Angeles.

19.     Robert Van Oordt is an individual and resident of California, County of Los Angeles.

20.     Steven Shuji Fukumoto is an individual and resident of California, County of Los Angeles.

21.     Celeb Card Group LLC is a California limited liability corporation with its principal place of business in Manhattan Beach, California, at Fatemi's personal residence.

22.     Prepaid Providers, LLC is a California limited liability company with its principal place of business in Manhattan Beach, California, at Bazan's personal residence.

23.     Prepaid Distributors, LLC is a California limited liability company with its principal place of business in Manhattan Beach, California.

24.     FTF Investments, LLC is a California limited liability company with its principal place of business in Manhattan Beach, California, at Fatemi's personal residence.

25.     Evox Management, LLC is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.

26.     Victor Felice is an individual and resident of Arizona.

27.     Mario Felice is an individual and resident of the country of Malta.

28.     Trilogy Ltd. is a Malta company with its principal place of business in Malta.

29.     Peak XV Ltd. is a Malta company with its principal place of business in Malta.

30.     CardOne Plus, Ltd. is a Canada corporation with its principal place of business in Canada, Province of Toronto, Ontario.

31.     Kevin Lewis is an individual and resident of Canada, Province of Toronto, Ontario.

32.     Allied Wallet is a Nevada corporation with its principal place of business in Beverly Hills, California.

33.     Ahmed Khawaja a/k/a Andy Khawaja is an individual and resident of California, County of Los Angeles.

34.     EZ Debit is a United Kingdom company with its principal place of business in the country of England.

35.     Anis Ghuman is an individual and resident of England.

36.     Sid Sohail is an individual and resident of England.

37.     GlobCash is a Florida corporation with its principal place of business in Miami, Florida.

38.     Global is a Florida corporation with its principal place of business in

Miami, Florida.

39. Sam Zormati is an individual and resident of Texas.

40. CardUSA, Inc. is a Florida corporation with its principal place of business in Hollywood, Florida.

41. Shoreline Solutions, Inc. is a Connecticut limited liability company with its principal place of business in Wallingford, Connecticut.

42. The true names and capacities, whether individual, corporate, or associate or otherwise of Defendants Does 1 to 300, inclusive, are unknown to the Bank at this time, and therefore the Bank sues said Defendants by such fictitious names, and when the true names of said Defendants are ascertained, the Bank will move this Court for leave to amend this complaint accordingly under Federal Rule of Civil Procedure 15(a).  These Doe Defendants could include major distributors, financial institutions and marketers in the debit card program industry. The Bank is informed and believes and thereon alleges that each of the Defendants designated herein as Doe is responsible in some manner for the events and happenings referred to herein, and proximately caused injuries and damages to the Bank as alleged herein.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

43.    Original jurisdiction in this Court is proper pursuant to 28 U.S.C. §1331 because the claims asserted herein arise under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et seq.* and the Promoters, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mails, or of the wires, or of the facilities of a nationally chartered bank in connection with the acts, practices, and courses of conduct alleged herein. This Court has supplemental juridiction over the state law claims pursuant to 28 U.S.C. §1367.

44.    Venue is proper within this Judicial District pursuant to 28 U.S.C. §1391(b), (c) and (d). Defendants Torres, Bazan and Fatemi reside and work in this Judicial District. Defendants Primo, CCG, Prepaid, FTF and Allied Wallet have their principal places of business and transact business in this Judicial District. The Bank has its principal place of business and transacts business in this Judicial District. All other Defendants maintain offices, have agents, transact business and/or are found within this Judicial District. Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein arose in part within this Judicial District, including the creation, implementation and deployment of the fraudulent scheme involving the debit card program and the Unauthorized Programs. Finally, the interstate trade and commerce described herein is and has

1  been carried out in part within this Judicial District.

2      45.    For the reasons set forth in the preceding paragraph, assignment to

3

4  the Western Division of this Court is proper.

5                          **GENERAL ALLEGATIONS**

6      46.    The Bank, on information and belief, alleges that all times mentioned

7

8  herein, each Defendant was acting as an agent, servant, or employee of each other

9  Defendant, and was acting within the course and scope of said agency and/or

10  employment.

11

12      47.    Each Defendant, with full knowledge, expressly and impliedly

13  ratified the acts of each other Defendant in all respects and adopted as his or its

14

15  own acts the acts of the other Defendants and each of them as set forth in detail

16  hereinafter.

17      48.    The following allegations, where noted, are made upon information

18  and belief. Due to the deceptive nature of the debit card program and a Bank

19

20  officer's corruption of the Bank's internal controls to detect and prevent the

21  fradulent scheme, the Bank reserves the right to modify or supplement these

22  allegations.

23

24

25

26

27

28

1

## OVERVIEW OF DEBIT CARD PROGRAMS

2      49.    The debit card business, when structured and used properly, is a

3

4    legitimate financial and banking tool for bank customers, allowing them to

5    transmit, transfer and access funds in a predetermined amount.  A customer can

6    purchase items through point-of-sale transactions, shop online or shop by

7

8    telephone.

9      50.    A legitimate debit card platform operates relatively simply.

10   Typically, a marketing company will work with a bank to create a program

11

12   whereby customers found by the marketing company purchase a debit card and

13   open an account with the bank.  Deposited funds are held in the customer's bank

14   account or a pooled account (sometimes called an "omnibus" account), allowing

15   the customer to charge only authorized amounts.  Traditionally, the bank will

16

17   establish daily maximum transaction limits, periodic transaction limits, daily

18   deposit limits and periodic deposit limits.  The purpose of these limits is to foster

19

20   effective monitoring and regulating of the sources and uses of funds.

21      51.    The customer is charged certain fees for the issuance and

22   administration of the debit card, which are then split between the marketing

23

24   company and the bank and other third parties involved in the processing and

25   handling of transactions.  In some instances, the marketing company will contract

26

27

28

- 14 -

with independend sales organizations ("ISO"), which will in turn market the debit cards to individual card holders.

52.    The sole security for debit card programs is the funds credited into the customers' bank accounts.  When the customers run out of available funds in their respective bank accounts, the debit cards linked to the bank accounts should ideally become disabled, at least, until there is a deposit of new funds.  Hence, when a customer opens an account in connection with a debit card, it is imperative that the issuing bank strictly monitor the transactions thereon for several reasons.  First, if transactions are not debited and credited in a timely way, the cardholder may be able to exceed the deposited amount, leaving the bank without any security for the overcharges.  Second, debit card programs are sometimes succeptible to abuse by illegal organizations both domestically and abroad, and banks must therefore comply with strict rules set forth by federal regulators and agencies such as the OCC, the Office of Foreign Assets Control ("OFAC") and the United States Department of Treasury.  If a bank is found to have violated these regulations, it may be subject to fines and other penalties, including the revocation of its federal charter.

## THE PROMOTERS' FRAUDULENT DEBIT CARD SCHEME

53.    The fraudulent debit card scheme in this case was developed by three primary individuals: Torres, Bazan and Fatemi (the "Core Conspirators"). Together they developed a plan in which Torres would use his role as an employee and officer of the Bank to establish a debit card program with a company in which Torres, Bazan and Fatemi have a direct pecuniary and ownership interest.

54.    Intending to bind the Promoters and the Bank, the Core Conspirators prepared a Letter of Intent and accompanying agreements. Core Conspirators Fatemi and Torres executed the Letter of Intent. All of these documents are conflicted transactions at their core. None of these individuals disclosed the conflict to the Bank. The nondisclosure by Torres is particularly disturbing inasmuch as he was, at all relevant times, the Bank's Executive Vice President, Bank Secrecy Officer, Chief Compliance Officer, and Chief Operating Officer. The nondisclosure by Fatemi is equally disturbing inasmuch as he a member of the Bar of the State of California.

55.    Once this program was established, the Core Conspirators planned to abuse and manipulate the Bank Accounts associated with the program for certain illegal purposes, including embezzlement, money laundering, wire fraud, mail fraud, bank fraud and drug trafficking. Further, the Core Conspirators conspired to establish the Unauthorized Programs in order to facilitate their illegal purposes with

even less scrutiny from the Bank. The ISO Defendants were an integral part of this plan in that they were aware that the programs were not authorized by the Bank, yet participated in the Unauthorized Programs.

## THE PROMOTERS INFILTRATE THE BANK

56.    Torres and Fatemi have known each other for nearly twenty years, and, along with their personal friend and soccer league teammate for several years, Bazan, became involved in a number of business ventures together, including CCG, Prepaid, FTF and Primo. (The Bank is informed and believes and thereon alleges that CCG, Prepaid, Prepaid Distributors and FTF were combined to form Primo in or around January 2007, and that the Core Conspirators retained an ownership interest in Primo. Accordingly, the term "Primo" shall hereafter refer collectively to these entities: CCG, Prepaid, Prepaid Distributors and FTF).

57.    The Core Conspirators planned to use Torres' multiple fiduciary roles at the Bank to cause the Bank to enter into various transactions with Primo to provide debit cards to Customers.

58.    Specifically, in November 2006, Torres represented to the Bank that Primo was interested in establishing a debit card program with the Bank. Neither Torres nor any of the other Promoters disclosed to the Bank at any time that Torres had a direct interest in Primo.

59.    Ostensibly through "negotiations," not at arms' length for certain,  the Core Conspirators proposed that the Bank, through Torres, would underwrite the debit card program and would maintain and administer the accounts established for cardholders in connection with the debit cards issued.  The Core Conspirators represented that they would market and sell the cards to individual cardholders and entities with debit card programs.  On or around December 4, 2006, Torres, on behalf of the Bank, and Fatemi, on behalf of Primo, executed a Letter of Intent memorializing this basic outline of the proposed debit card program (the "Primo Program"), which Fatemi signed on behalf of  Primo.

60.    Once the Primo Program was established, the Promoters used Torres' position at the Bank to their full advantage in several ways.  First, they conspired to have Torres hire persons with little or no banking experience to oversee and administer the Primo Program.  Many of the personnel hand-selected by Torres were inexperienced in compliance matters and the debit card business.  Some personnel that Torres hired, while experienced in compliance matters, were fiercely loyal to Torres, like Fukumoto.  All of these employees, both loyal to Torres for employing them and impressed by his feigned appearance of professionalism and claimed expertise in banking compliance, particularly anti-money laundering , were ill-equipped and unmotivated to detect and understand the fraudulent scheme concocted by the Core Conspirators and the rest of the Promoters. Fukumoto, in

particular, was an active participant in the fraudulent debit card program scheme. Fukumoto not only concealed its existence from the Bank, but as will be demontrated below, he actively perpetrated the fraud at Torres' instruction. Coupled with the inexpereinced employees retained by Torres to monitor the debit card programs, the programs were vulnerable for mass abuse. The corrupted system intentionally established by Torres allowed the Promoters to transfer money in, out and between the Bank Accounts for the purposes of embezzlement, conversion, money laundering, wire fraud, mail fraud, bank fraud and drug trafficking. All of these activities took place without detection by the Bank because the persons charged with detection were manipulating, corruption and abusing the Bank and its compliance programs.

61.    Second, the Promoters conspired to cause the Bank to use an inadequate software program for the administration of the Primo Program and Unathorized Programs. Specifically, Torres made sure that the Bank did not use the fraud detection software, which is standard in the industry, and instead relied on a software program developed by Victor Felice, who had a direct pecuniary interest in ISO Defendants Evox and its debit card programs known as Accent and Nico. Rather than retaining an independent, experienced computer programmer, Torres engaged into yet another conflicted transaction to the detriment of the Bank. Not only did Torres fail to conduct due diligence prior to giving Felice access to

1    the Bank's internal database, but Torres had absolutely no knowledge nor interest

2    in determining whether the software program developed and implemented by

3

4    Felice was obtained legtimately and within proper licensing specifications. The

5    software program debacle also exposed the Bank to leakage of its confidential and

6    proprietary information to Felice and, consequently, through Felice, to all of the

7

8    Defendants.

9        62.    Next, the Promoters used Torres' role at the Bank to gain access to the

10   Bank's logo, letterhead, service marks and other proprietary materials in order to

11

12   promote the Unauthorized Programs. With the assistance of the Promoters,

13   specifically Oscar Bazan, Fatemi, and Montalvo, advertising and marketing

14   materials were prepared without the Bank's approval, but which repeatedly

15

16   disclosed the Bank as the program sponsor and underwriter and contained the

17   Bank's name, logo, service marks and other intellectual property. Then, still

18   without the knowledge or consent of the Bank, the Promoters scoured the world for

19

20   ISOs to both become Customers and to find and engage additional individual card

21   holders as Customers.

22       63.    The Promoters, at least one of whom is a convicted criminal himself

23

24   (Bazan), then selected other business partners, the ISO Defendants. Together the

25   Promoters and ISO Defendants ordered debit cards bearing the Bank's logo, name,

26   service marks and other intellectual property. None of this clandestine conduct

27

28

1   was approved by the Bank, and no written contracts existed between the Bank and

2   any of the ISO Defendants.

4       64.    The Promoters concealed their wide-reaching misrepresentations

5   regarding the Unauthorized Programs, and repeatedly represented to the Bank that

6   the Bank was not transacting any type of debit card business with any entities.  In

7   reality, the Promoters were conducting such business with all of the ISO

8

9   Defendants without the authority of the Bank.

10      65.    As a fiduciary to the Bank and its Customers, Torres was responsible

11  for detecting and preventing the very type of fradulent scheme which victimized

12

13  the Bank.  Torres, however, masked from the Bank the fraudulent conduct for quite

14  some time.

15

16              **THE PROMOTERS HOLD THEMSELVES OUT AS**

17              **REPRESENTATIVES OF THE BANK**

18      66.    Torres delegated many of his core functions, including his duties as

19

20  Chief Compliance Officer, Chief Operating Officer and Bank Secrecy Officer, to

21  Bazan, Fatemi, Felice, Kwahaja and Oscar Bazan, among other Promoters.

22  Essentially, Bazan become the *de facto* delegate to the Bank in connection with the

23

24  development and implementation of compliance policies, anti-money laundering

25  procedures, advertising and marketing policies and Visa protocol, among other

26  policies.  The Promoters were at all times aware, or should have known, that Bazan

27

28

1   is a convicted criminal who served approximately 60 months in prison for cocaine

2   distribution and intent to distribute cocaine.

3
4        67.    The Promoters were also at all times aware, or should have known,

5   that shortly after his release from prison, Bazan, Fatemi, Oscar Bazan and Torres

6   bankrupted a debit card business known as Prepaid Providers, LLC.  On

7   information and belief, Bazan fraudulently transferred pecuinary interests in
8
9   Prepaid Providers, LLC to Primo, to the detriment of creditors of Prepaid

10  Providers, LLC.  Fatemi, Torres, Bazan and Oscar Bazan were two beneficiaries of

11
12  the fraudulent transfer and are, consequently, co-conspirators in that fradulent

13  transaction as well.

14       68.    Torres' delegation of his duties to non-Bank personnel was designed

15  to give the Promoters the freedom to manipulate and corrupt the Bank processes and
16
17  procedures to their full advantange.

18       69.    In addition to the delegation of duties to Bazan, Torres allowed

19  Fatemi to hold himself out as attorney for the Bank to potential customers and card
20
21  program providers.  Though Fatemi is an attorney, he has never been retained by

22  the Bank in any capacity whatsoever.  Fatemi falsley claimed to represent the Bank

23  in negotiations with potential ISOs.  Fatemi falsely prepared agreements, letters
24
25  and other documents for Torres to sign on Bank letterhead.  Torres repeatedly and

26  falsely claimed that Fatemi represented the Bank in third party transactions and

27
28

permitted Fatemi to prepare documents purporting to bind the Bank or at least give a false appearance that the Bank authorized the Unauthorized Programs. All of these activities were done without the Bank's knowledge or consent. Fukumoto was aware of these activities, but never reported them to the Bank.

70.    Specifically, there are a number of draft agreements between Primo and certain ISO Defendants which Fatemi negotiated and drafted, all under the pretense that he was the Bank's attorney. These documents include, but are not limited to: a "Reseller Agreement" dated January 22, 2007 between Primo and CardOne; an "Independent Sales Organisation Agreement" dated March 20, 2007; an "Agreement" dated June 6, 2007 between Primo and Global Payment, Inc.; and a "Reseller Agreement" dated June 25, 2007 between Primo and Omnicash Payment Systems, Inc.

71.    The Promoter's knowledge that Fatemi was fraudulently holding himself out as attorney for the Bank demonstrates that they never intended to negotiate legitimate debit card businesses with the Bank, and instead sought to defraud the Bank.

## THE DEFENDANTS DEFRAUD THE BANK

72.    The Defendants defrauded the Bank in several major ways. First, as Primo began to issue card programs pursuant to its own program, it consistently directed proceeds from card sales away from Bank. The Promoters used Torres' role at the Bank to ensure that all card program proceeds were either deposited into Bank Accounts held by the Promoters, or were paid directly to the Promoters via unauthorized payment transmittals outside of the Bank. Whichever fashion the proceeds were received by the Defendants, the proceeds were quickly siphoned away from the Bank and never disclosed to the Bank.

73.    Second, the Promoters negotiated clandestine agreements with the ISO Defendants to ensure that they dealt directly and only with the Promoters, as opposed to the Bank. This ensured that the Unauthorized Programs, as well all proceeds from the sale of cards thereunder, remained concealed from the Bank. As with the proceeds from the Unauthorized Programs, the Core Conspirators deposited all such funds directly into the Promoters' accounts, or paid directly to the Promoters  outside of the Bank.

74.    Third, the Promoters have repeatedly misrepresented themselves as Bank employees. Bazan was particularly offensive in this regard. Bazan routinely represented to the Defendants and the outside world as a Bank employee and affiliate, even misrepresenting that he maintained an office at the Bank. He also

profited at the Bank's expense in other ways. He routinely offered consulting services for debit card programs, ostensibly provided by the Bank, in order to attrach new Customers.

75.    Bazan and Fatemi's misrepresentations were designed to profit at the Bank's expense and accelerate the process of attracting new ISOs and Customers, all without regard for the caustic impact it might have on the Bank. All of these misrepresentations were committed with knowledge by Torres and Fukumoto, but never reported to the Bank.

76.    Fourth, the Core Conspirators developed a scheme to fraudulently issue debit cards to persons outside the United States. Specifically, the Promoters would cause Customers to purchase debit cards. The Core Conspirators would order debit cards from Shoreline and CardUSA, among other debit card providers, to be delivered to the Bank. Torres would then cause the cards to be delivered, sometimes even hand-delivered by Torres himself, to Bazan. The Promoters knew these illegal activities were taking place. The Core Consipirators, either collectively or with the knowledge and consent of the others, would then illegally open sealed envelopes containing debit cards of Bank customers. The Core Conspirators would then reinsert the cards into Primo envelopes and transmit the cards internationally. These activities amount to mail tampering, wire fraud, mail fraud and bank fraud.

77. Fifth, the Promoters routinely commingled client funds with other client funds, as well as with Defendants' Bank Accounts. Commingling funds made it difficult for the Bank to track and monitor the accounts, and allowed the Promoters to use these accounts to launder funds obtained from illegal enterprises. The fact that Torres and Fukumoto allowed the Promoters to commingle funds made it impossible for the Bank to uncover these illegal activities.

78. And finally, Torres issued an unknown number of "test" cards to the Defendants. These test cards were linked to unrelated, existing Bank Accounts, were activated by the Promoters, and were then used repeatedly by various Defendants to withdraw, transmit or transfer funds. Some of the issued debit cards had high limits even though Torres never followed proper Bank protocol for issuance of debit cards. All such withdrawals from Bank Accounts amount to acts of conversion by such Defendants, the total amount of which has yet to be ascertained.

## THE DEFENDANTS CAUSE THE BANK TO BECOME NON-COMPLIANT WITH VISA'S RULES AND REGULATIONS

79. A major element of the success of any debit card program is accessibility: the ability to use the card at many locations. In this case, Primo planned to have all cards linked to the Visa network, enabling cardholders to use the cards at any location accepting Visa. In order to do this, Primo was first

required to submit an application to Visa for each debit card program.  For

instance, Primo contracted with numerous ISOs to sell the debit cards to

individuals.   In order to have a particular ISO's cards linked to Visa, Primo was

required to submit certain financial documentation to Visa regarding that ISO.

Without full documentation regarding the operation of the particular debit card

program and all parties involved, Visa would not approve the debit card program

for inclusion in the Visa network.  The documenation required by Visa included

thorough finanaical records for each ISO, as well as information regarding its

ownership, intended market, and the like.

      80.    Knowing full well that Primo, whose members consisted of a

convicted felon and others who recently bankrupted a similar business, would

never receive Visa approval, the Core Conspirators conspired and colluded to

avoid Visa protocol.  The Core Conspirators, particularly Torres, took the position

that Visa approval was not necessary.  Torres began misrepresenting to Visa that

the Bank objected to Visa's position that Primo had to register as an ISO.  Torres

caused the Bank to lead a negative and indefensible campaign against Visa without

the Bank's authorization.  Torres caused the Bank to take identical positions with

other Defendants as well.

      81.    The Core Conspirators, particuarly Torres, also caused the Bank to

misrepresent to Visa that certain Defendants were not soliciting debit card business

when in fact that was exactly what was taking place. In several cases, the Defendants failed to submit the documentation required by Visa for ISO approval, instead representing that those ISO were not reselling the card, and/or were involved in the program in some other capacity. They did this intentionally to avoid any scrutiny by Visa, as the Promoters' ultimate goal was to hide the majority of the debit card programs from the Bank in order to keep all profits therefrom.

82.     On or around August 1, 2007, Visa's compliance department sent a warning letter to Torres at the Bank regarding the fact that Allied Wallet, an ISO Defendant, was in fact soliciting cardholders for debit cards from the Bank in violation of Visa's rules and regulations. Specifically, Visa alleged that Allied Wallet was offering debit cards to individuals in countries currently under sanction by the United States government, including the Islamic Republic of Iran. The Visa letter cautioned the Bank that its entire Visa program may be stripped from the Bank as a result of the Defendants' activities.

83.     Torres and Fukumoto concealed and secreted from the Bank the August 1, 2007 letter from Visa. They also attempted to conceal the compliance concerns raised by Visa as well as the imposition of fines and the potential loss of the Visa program.

84.    As Bank fiduciaries, Torres and Fukumoto were required to alert senior Bank personnel to the threats raised by Visa, especially the compliance concerns, the imposition of fines and the loss of the Visa program. Instead, they concocted a way to conceal these facts. Torres and Fukumoto secretly traveled together to San Francisco to attend a high-level compliance meeting with senior Visa officers. Torres and Fukumoto alerted no one at the Bank to this meeting.

85.    In order to dupe Visa into believing that nothing was awry at the Bank, Torres and Fukumoto prepared a fraudulent and unauthorized Resolution of the Board of Directors. The Resolution fraudulently stated that the Bank's Board of Directors was aware of Visa's inquiry and agreed to abide by Visa's rules and regulations. The Resolution was presented to Visa at the meeting, but never presented (formally or informally) to the Bank's Board. The fraudulent Resolution demonstrates a premeditated intent to defraud the Bank.

86.    Visa consequently fined the Bank in the amount of $10,000. Torres, Fukumoto and the Promoters manufactured a series of activities to keep the Bank in the dark: the Promoters caused Primo to pay the $10,000 fine so that the Bank would not see the fine on its books and records, and they concealed all evidence of the Visa complaint and subseqent fine from the Bank.

# THE DEFENDANTS' FRAUD UNRAVELS

87.    In or around November 2007, after defrauding the Bank for nearly one year, the Defendants' fraud was discovered by the Bank.  Specifically, after reviewing the Bank's financial statements for the third quarter of 2007, a senior officer at the Bank requested a more detailed statement of the finances for the debit card programs.  The Bank officer demanded these documents from Torres.

88.    In response to the request, Torres provided only a snapshot summary of the financials for the debit card programs.   Based on Torres' failure to provide the requested financials for the debit card programs, the senior officer of the Bank grew suspicous and asked the Bank's accounting department to review the debit card program operations and books and records.  It was then shortly discovered that Torres was manipulating the Bank Accounts through multiple unauthorized transfers between and among the Defendants' accounts, that Torres and the other Promoters were operating numerous Unauthorized Programs, and that the Bank was under heavy scrutiny from Visa in connection with the Unauthorized Programs.

89.    Based on these discoveries, the Bank called for a more thorough internal investigation of the operations of the Primo Program, as well as the Unauthorized Programs.  The Bank immediately placed Torres on paid administrative leave and suspended the operation of the Unauthorized Programs.

1  When questioned about his involvement in the Primo Program and the

2  Unauthorized Program, Fukumoto quickly resigned from the Bank.

3
      90.    The internal investigation revealed the basis for the allegations

4
5  herein, including but not limited to the fact that: (1)  Torres has had a secret and

6  undisclosed pecuniary interest in Primo at all times; (2) Torres delegated his Bank

7
   duties to Bazan, Fatemi, Oscar Bazan, Felice and Kwahaja; (3) Fatemi held himself

8
9  out as Bank counsel in negotiations with ISOs; (4) the Promoters caused the Bank

10  to adopt a corrupt system for oversight of the Unauthorized Programs;  (5) the

11
   Promoters caused corrupted the Bank's system for monitoring the Unauthorized

12
13  Programs in order to control and manipulate these activities without any oversight;

14  (6) the Promoters routinely intercepted and tampered with cards mailed to

15
   cardholders; (7) the Promoters used Torres' role at the Bank to embezzle and

16
17  convert money from the Bank and from the Bank Accounts;  (8) the Promoters

18  used Torres' role at the Bank to launder money and commit wire fraud via

19
   transfers among the Bank Accounts; and (9) the Promoters and the ISO Defendants

20
21  were operating the Unauthorized Programs in noncompliance with numerous

22  federal regulations, subjecting the Bank to multiple fines and penalties, including

23
   the possible revocation of its federal charter.

24
25      91.    Even though the Bank did not approve of the conduct of the

26  Defendants, the Bank could not, and did not, detect the fraudulent scheme on a

27

28

prior date. Torres corrupted Bank policies and procedures, Bank personnel, the compliance protocols, the fraud detection systems and a number of other systems of checks and balances for uncovering the Defendants' fraudulent conduct. Indeed, it was Torres and Fukumoto themselves who were responsible for detecting, surpressing, reporting and thwarting these types of frauds. Sadly, it was Torres who served as the chief culprit at the epicenter of this fraudulent scheme.

## DEFENDANTS' FRAUDULENT SCHEME REQUIRED ALL DEFENDANTS TO CONSPIRE AGAINST THE BANK

92.    Defendants did not undertake the above described actions in isolation, but instead did so as part of a common scheme and conspiracy.

93.    Each member of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy. They also agreed to, and actually committed, the above alleged acts of fraud and unlawful conduct with the goal of depriving the Bank of its money, property, good will, reputation and federally-sanctioned bank charter in connection with the fraudulent debit card program scheme.

94.    Indeed, for the fraudulent debit card program scheme described above to be successful, each member of the conspiracy had to agree to enact and utilize the same devices and fraudulent tactics against the Bank.

95.    Numerous common facts and similar activities evidence the existence of a conspiracy among Defendants, including, *inter alia*: (a) the common ownership among the Defendants of multiple of the Promoter entities, including Primo, CCG, Prepaid and Prepaid Distributors; (b) the knowledge among all Defendants that Torres was an officer of the Bank and held an interest in certain Defendant entities, including Primo, CCG, Prepaid, Prepaid Distributors and FTF. Within the applicable statute(s) of limitations, the conspiracy was conducted through and implemented by: (a) Defendants' development and/or the sanctioned use of uniformly deceptive marketing materials and presentations, which omitted material facts about the Bank's lack of knowledge or approval of the debit card programs; (b) Defendants' concealment of the existence of the unauthorized debit card programs from the Bank; and (c) Defendants' concealment and conversion of the profits from the unauthorized debit card programs.

## THE DEFENDANTS' CONDUCT HAS DAMAGED THE BANK

96.    As of today's date, the Bank has incurred $35,000 in fines from Visa based on the non-compliance of the Unauthorized Programs. The Bank is aware that it faces additional and further fines from Visa as a result of the Unauthorized Programs in the amount of not less than $25,000 and potentially up to $1 million. In addition, the potential loss of its Visa program, which would expose the Bank to millions of dollars in exposure and cause substantial lost opportunities, causes

damages to the Bank in an amount not less than $50 million.

97.    The Bank is aware of claims against it from Shoreline and FirstUSA in an amount not less than $100,000.

98.    The Bank and/or its agents may be subject to fines by regulators in an amount not less than $1,175,000 per day, which could potentially exceed $105 million.

99.    If the Bank is stripped of its federal charter, its damages will exceed an amount not less than $200 million.

100.    The Bank has also been damaged by the Promoters' aforementioned acts in that the Bank has suffered losses due to the Promoters' conversion and embezzlement of funds and lost opportunities in the amount unknown at this time, but is, on information and belief, exceeding $10 million.

101.    The Bank has also incurred legal fees and expects to incur additional legal fees.

102.    The Bank hereby reserves its right to amend or supplement this pleading as it becomes aware of other claims and exposure to liability.

# FIRST CAUSE OF ACTION

## (Declaratory Relief Against All Defendants)

103.  Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 102 above.

104.  An actual controversy has arisen and now exists between the Bank and all Defendants regarding their respective rights and duties in that the Bank contends it is not obligated pursuant to any contracts between the Promoters and the ISO Defendants concerning the Unauthorized Programs.

105.  The Bank desires a judicial determination of its rights and duties, and a declaration that the Bank is not obligated in any way under the Unauthorized Programs established by the Promoters and the ISO Defendants.

106.  The Bank desires a judicial determination of its rights and duties, and a declaration that the Defendants have no right, title or interest in the Unauthorized Programs and that they must release all claims and further indemnify the Bank for any claims brought against it in connection with the Unauthorized Programs.

107.  A judicial declaration is necessary and appropriate at this time under the circumstances in order that the Bank may ascertain its rights and duties under the Unauthorized Programs, as these programs may subject the Bank to large fines from contracting parties, governmental regulatory agencies, and/or result in the revocation of the Bank's federal charter.

108.   Wherefore, the Bank prays for judgment against all Defendants, and each of them, as hereinafter set forth.

## SECOND CAUSE OF ACTION

### (Civil Racketeer Influenced and Corrupt Organization Act Against Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 1-25, inclusive)

109.   Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 108 above.

110.   The Bank is a "person" within the meaning of 18 U.S.C. §1961(3), and the Bank has sustained injury to its business or property as a result of the acts and the conduct of Defendants described herein.

111.   Primo is a "person" within the meaning of 18 U.S.C. §1964(3).

112.   Torres is a "person" within the meaning of 18 U.S.C. §1964(3).

113.   Bazan is a "person" within the meaning of 18 U.S.C. §1964(3).

114.   Fatemi is a "person" within the meaning of 18 U.S.C. §1964(3).

115.   Oscar Bazan is a "person" within the meaning of 18 U.S.C. §1964(3).

116.   Montalvo is a "person" within the meaning of 18 U.S.C. §1964(3).

117.   Prepaid is a "person" within the meaning of 18 U.S.C. §1964(3).

118.   Prepaid Distributors is a "person" within the meaning of 18 U.S.C.

1   §1964(3).

2        119.  FTF is a "person" within the meaning of 18 U.S.C. §1964(3).

3        120.  Fukumoto is a "person" within the meaning of 18 U.S.C. §1964(3).

4

5        121.  Mrs. Van Oordt is a "person" within the meaning of 18 U.S.C.

6   §1964(3).

7        122.  Mr. Van Oordt is a "person" within the meaning of 18 U.S.C.

8

9   §1964(3).

10       123.  Celeb is a "person" within the meaning of 18 U.S.C. §1964(3).

11       124.  Evox is a "person" within the meaning of 18 U.S.C. §1964(3).

12

13       125.  Victor Felice is a "person" within the meaning of 18 U.S.C. §1964(3).

14       126.  Allied Wallet is a "person" within the meaning of 18 U.S.C. §1964(3).

15       127.  Kwahaja is a "person" within the meaning of 18 U.S.C. §1964(3).

16

17       128.  The Promoters are a group of closely associated individuals and legal

18  entities which share common ownership.  The Promoters have the common

19  purpose of marketing, soliciting and selling various types of debit card programs,

20

21  and together constitute an "enterprise" within the meaning of 18 U.S.C. §1961(4).

22       129.  The Promoters comprise an ongoing organization which engages in,

23  and whose activities affect, interstate commerce.

24

25       130.  While the Promoters participate in and are members and part of

26  conspiracy to defraud the Bank, they also have an existence separate and distinct

27

28

- 37 -

from the enterprise, as evidenced by, *inter alia*, their respective corporate,

partnership and individual identities.

131.    Beginning on or about December 4, 2006, the Promoters conspired to

use Torres' role as an employee and officer of the Bank to establish the Primo

Program and to use the Bank Accounts associated therewith for illegal purposes,

including conversion, embezzlement, money laundering, commingling funds, tax

evasion, debit card fraud, mail fraud, wire fraud, bank fraud and drug trafficking.

132.    Once the Primo Program was established, the Promoters caused

Torres to transfer funds to, from and between the associated Bank Accounts for

these purposes.

133.    Also beginning on or about December 4, 2006, the Promoters used the

mails to misrepresent to the community at large that the Bank was underwriting the

Unauthorized Programs by sending marketing materials, solicitations and other

communications to members of the financial community containing such

statements.  These representations were in fact false when made.  The truth was

that the Bank was not aware of the Unauthorized Programs, and did not authorize

Torres, or any of the Promoters, to establish the Unauthorized Programs.

134.    The Promoters also routinely intercepted and tampered with mail

directed to individual cardholders within the Primo Program and the Unauthorized

Programs.

135.    As of today's date, the Bank has incurred $35,000 in fines from Visa based on the non-compliance of the Unauthorized Programs.  The Bank is aware that it faces additional and further fines from Visa as a result of the Unauthorized Programs in the amount of not less than $25,000 and potentially up to $1 million.  In addition, the potential loss of its Visa program, which would expose the Bank to millions of dollars in exposure and cause substantial lost opportunities, causes damages to the Bank in an amount not less than $50 million.  The Bank is aware of claims against it from Shoreline and First in an amount not less than $100,000.  The Bank is subject to fines by the OCC in an amount not less than $1,175,000 per day, which could potentially exceed $105 million.  If the Bank is stripped of its federal charter, its damages will exceed an amount not less than $200 million.  The Bank has also been damaged by the Promoters' aforementioned acts in that the Bank has suffered losses due to the Promoters' conversion and embezzlement of funds and lost opportunities in the amount unknown at this time, but is, on information and belief, exceeding $10 million.  The Bank has also incurred legal fees and expects to incur additional legal fees.

# THIRD CAUSE OF ACTION

## (Common Law Fraud Against Torres, Fukumoto,

## Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt,

## Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors,

## FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 26-50, inclusive)

136. Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 135 above.

137. Beginning on or about December 4, 2006, Torres and Fukumoto continuously represented to the Bank that they would administer the Primo Program in accordance with his duties and responsibilities as officers of the Bank. This representation was in fact false when made. The truth was that Torres and Fukumoto planned to breach their duties to the Bank by administering the Primo Program to benefit themselves and the Promoters by, among other things, using the Bank Accounts for illegal purposes such as conversion, embezzlement, money laundering, commingling funds, tax evasion, debit card fraud, mail fraud, wire fraud, bank fraud and drug trafficking.

138. Also beginning on or about December 4, 2006, Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 26-50 failed to disclose and actively concealed from the Bank

1    that Torres had/has a direct interest in Primo and CCG, among others.

2    139.   Also beginning on or about December 4, 2006, Torres, Fukumoto,

3

4    Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo,

5    Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet,

6    Kwahaja and Does 26-50 misrepresented to the community at large that the Bank

7

8    was underwriting the Unauthorized Programs by sending marketing materials,

9    solicitations and other communications to members of the financial community

10   containing such statements.  These representations were in fact false when made.

11

12   The truth was that the Bank was not aware of the Unauthorized Programs, and did

13   not authorize Torres to establish the Unauthorized Programs.

14   140.   When Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo,

15   Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF,

16

17   Evox, Victor Felice, Allied Wallet, Kwahaja and Does 26-50 made all of the

18   foregoing misrepresentations and omissions to the Bank, they, and each of them,

19

20   knew the misrepresentations to be both false and material, and made them with the

21   intention of deceiving and inducing the Bank to entrust Torres with the oversight

22   of the Primo Program, and of using the Bank Accounts for illegal purposes.

23

24   141.   At the time these representations were made by Torres, Fukumoto,

25   Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo,

26   Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet,

27

28

Kwahaja and Does 26-50, and at the time the Bank took the actions herein alleged, the Bank was ignorant of the falsity of the representations made by Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 26-50, and believed them to be true.

142.  Had the Bank known the actual facts, it would not have ever allowed any of these individuals to conduct the Unauthorized Programs and open the Bank Accounts. The Bank's reliance on the defendant's representations was justified because Torres and Fukumoto were employees of the Bank and represented that Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 26-50 were persons and entities with legal and proper business at the Bank.

143.  As of today's date, the Bank has incurred $35,000 in fines from Visa based on the non-compliance of the Unauthorized Programs. The Bank is aware that it faces additional and further fines from Visa as a result of the Unauthorized Programs in the amount of not less than $25,000 and potentially up to $1 million. In addition, the potential loss of its Visa program, which would expose the Bank to millions of dollars in exposure and cause substantial lost opportunities, causes damages to the Bank in an amount not less than $50 million. The Bank is aware of

1 | claims against it from Shoreline and First in an amount not less than $100,000.

2 | The Bank is subject to fines by the OCC in an amount not less than $1,175,000 per

3 | 
4 | day, which could potentially exceed $105 million. If the Bank is stripped of its

5 | federal charter, its damages will exceed an amount not less than $200 million. The

6 | Bank has also been damaged by the Promoters' aforementioned acts in that the

7 | 
8 | Bank has suffered losses due to the Promoters' conversion and embezzlement of

9 | funds and lost opportunities in the amount unknown at this time, but is, on

10 | information and belief, exceeding $10 million. The Bank has also incurred legal

11 | 
12 | fees and expects to incur additional legal fees.

13 |     144.  The Defendants' aforementioned conduct consisted of intentional

14 | misrepresentations, deceit, and concealment of material facts known to these

15 | 
16 | Defendants with the intention of depriving the Bank of property or legal rights or

17 | otherwise causing injury.  Further, the Defendants' conduct was despicable and

18 | subjected the Bank to cruel and unjust hardship in conscious disregard of the

19 | 
20 | Bank's rights, so as to justify an award of exemplary and punitive damages.

21 | 
22 | 
23 | 
24 | 
25 | 
26 | 
27 | 
28 |

# FOURTH CAUSE OF ACTION

**(Fraudulent Misrepresentation Against Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 51-75, inclusive)**

145.   Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 144 above.

146.   Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 51-75 failed to disclose and actively concealed from the Bank that Torres had/has a direct interest in Primo and CCG, among others.

147.   Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 51-75 knew that Torres' interest in Primo was a material fact, which they concealed with the intention of deceiving and inducing the Bank to entrust Torres and Fukumoto with the oversight of the Primo Program, and of using the Bank Accounts for illegal purposes.

148.   In the absence of this material information, the Bank was induced to and did entrust Torres and Fukumoto with the administration of the Primo Program

within the Bank. Had the Bank known the actual facts, it would not have done so.

149.    The aforementioned conduct by Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 51-75 consisted of intentional misrepresentations, deceit, and concealment of material facts known to these Defendants with the intention of depriving the Bank of property or legal rights or otherwise causing injury. Further, the conduct by Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 51-75 was despicable and subjected the Bank to cruel and unjust hardship in conscious disregard of the Bank's rights, so as to justify an award of exemplary and punitive damages.

150.    As of today's date, the Bank has incurred $35,000 in fines from Visa based on the non-compliance of the Unauthorized Programs. The Bank is aware that it faces additional and further fines from Visa as a result of the Unauthorized Programs in the amount of not less than $25,000 and potentially up to $1 million. In addition, the potential loss of its Visa program, which would expose the Bank to millions of dollars in exposure and cause substantial lost opportunities, causes damages to the Bank in an amount not less than $50 million. The Bank is aware of claims against it from Shoreline and First in an amount not less than $100,000.

The Bank is subject to fines by the OCC in an amount not less than $1,175,000 per day, which could potentially exceed $105 million. If the Bank is stripped of its federal charter, its damages will exceed an amount not less than $200 million. The Bank has also been damaged by the Promoters' aforementioned acts in that the Bank has suffered losses due to the Promoters' conversion and embezzlement of funds and lost opportunities in the amount unknown at this time, but is, on information and belief, exceeding $10 million. The Bank has also incurred legal fees and expects to incur additional legal fees.

### FIFTH CAUSE OF ACTION

**(Fraudulent Concealment Against Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 76-100, inclusive)**

151.    Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 150 above.

152.    Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 76-100 concealed from the Bank that Torres had/has a direct interest in Primo and CCG, among others.

153.   Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 76-100 knew that Torres' interest in Primo was a material fact, which the Defendants herein concealed with the intention of deceiving and inducing the Bank to entrust Torres with the oversight of the Primo Program, and of using the Bank Accounts for illegal purposes.

154.   In the absence of this material information, the Bank was induced to and did entrust Torres with the administration of the Primo Program within the Bank.  Had the Bank known the actual facts, it would not have done so.

155.   As of today's date, the Bank has incurred $35,000 in fines from Visa based on the non-compliance of the Unauthorized Programs.  The Bank is aware that it faces additional and further fines from Visa as a result of the Unauthorized Programs in the amount of not less than $25,000 and potentially up to $1 million.  In addition, the potential loss of its Visa program, which would expose the Bank to millions of dollars in exposure and cause substantial lost opportunities, causes damages to the Bank in an amount not less than $50 million.  The Bank is aware of claims against it from Shoreline and First in an amount not less than $100,000.  The Bank is subject to fines by the OCC in an amount not less than $1,175,000 per day, which could potentially exceed $105 million.  If the Bank is stripped of its federal charter, its damages will exceed an amount not less than $200 million.  The

1  Bank has also been damaged by the Promoters' aforementioned acts in that the

2  Bank has suffered losses due to the Promoters' conversion and embezzlement of

3
4  funds and lost opportunities in the amount unknown at this time, but is, on

5  information and belief, exceeding $10 million. The Bank has also incurred legal

6  fees and expects to incur additional legal fees.

7
8      156.   The conduct by Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi,

9  Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid

10 Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 76-100

11
12 consisted of intentional misrepresentations, deceit, and concealment of material

13 facts known to the Promoters with the intention of depriving the Bank of property

14 or legal rights or otherwise causing injury. Further, the Defendants' herein

15
16 conduct was despicable and subjected the Bank to cruel and unjust hardship in

17 conscious disregard of the Bank's rights, so as to justify an award of exemplary

18 and punitive damages.

19
20                      **SIXTH CAUSE OF ACTION**

21        **(Negligent Misrepresentation Against All Defendants)**

22     157.   The Bank hereby incorporates by reference and realleges each and

23
24 every allegation set forth in paragraphs 1 through 156 above.

25     158.   The Defendants' acts as set forth herein constitute negligent

26 misrepresentation.

27
28

- 48 -

159. As alleged herein above, the Defendants failed to disclose and actively concealed from the Bank that the existence, corruption, conflicted transactions and siphoning of profits, among other things, in connection with the Primo Program and the Unauthorized Programs.

160. As alleged herein above, the Defendants misrepresented to the community at large that the Bank was underwriting the Unauthorized Programs by sending advertising and marketing materials, solicitations and other communications to members of the financial community containing such statements.

161. The Defendants made the foregoing representations and omissions with the intention of inducing the Bank to rely thereon and entrust the Defendants with the administration of the Unauthorized Program and the Bank Accounts.

162. The Defendants made the foregoing representations and omissions knowing that they were material, but without any reasonable belief that they were true.

163. In reliance on the foregoing representations and omissions, the Bank did in fact entrust the Defendants with the administration of the Unauthorized Program and the Bank Accounts.

164. As of today's date, the Bank has incurred $35,000 in fines from Visa based on the non-compliance of the Unauthorized Programs. The Bank is aware

that it faces additional and further fines from Visa as a result of the Unauthorized

Programs in the amount of not less than $25,000 and potentially up to $1 million.

In addition, the potential loss of its Visa program, which would expose the Bank to

millions of dollars in exposure and cause substantial lost opportunities, causes

damages to the Bank in an amount not less than $50 million. The Bank is aware of

claims against it from Shoreline and First in an amount not less than $100,000.

The Bank is subject to fines by the OCC in an amount not less than $1,175,000 per

day, which could potentially exceed $105 million. If the Bank is stripped of its

federal charter, its damages will exceed an amount not less than $200 million. The

Bank has also been damaged by the Promoters' aforementioned acts in that the

Bank has suffered losses due to the Promoters' conversion and embezzlement of

funds and lost opportunities in the amount unknown at this time, but is, on

information and belief, exceeding $10 million. The Bank has also incurred legal

fees and expects to incur additional legal fees.

## SEVENTH CAUSE OF ACTION

### (Unlawful, Deceptive and Unfair Business Practices —*California Business and Professional Code* §17200, et seq., Against All Defendants)

165.   The Bank hereby incorporates by reference and realleges each and

every allegation set forth in paragraphs 1 through 164 above.

166.   The Defendants' acts as set forth herein constitute business practices

that are unlawful, deceptive and unfair in violation of California Business &

Professional Code §17200, *et seq.*

167.   The Defendants' unlawful, deceptive and unfair business acts and

practices have caused, and unless enjoined will continue to cause, irreparable

injury and other losses to the Bank for which it has no adequate remedy at law. The

Bank is therefore entitled to restitution and a permanent injunction prohibiting the

Defendants, their agents, servants, and employees, and all persons acting

thereunder, in concert with, or on their behalf, from engaging in the wrongful

conduct described herein.

## EIGHTH CAUSE OF ACTION

### (Untrue or Misleading Advertising Against All Defendants)

168.   Plaintiff hereby incorporates by reference and realleges each and

every allegation set forth in paragraphs 1 through 167 above.

169.   At all times herein mentioned, the Defendants owned and operated

businesses engaged in the marketing and/or sale of debit cards attached to bank

accounts based in California.

170.   Beginning in or about December 2006 and continuing to the present

time, the Defendants engaged in deceptive and misleading advertising to the

public, and offering for sale certain debit cards under the Unauthorized Programs.

The Defendants' advertising is actionable here because the Defendant utilized and

relied heavily on the Bank's name, the Bank's logo, the Bank's good will, logo, name, service marks and other intellectual property owned by the Bank.

171. The advertisements were disseminated to and received by the public in California, and in a number of other states outside of California, in countries outside of the United States and worldwide by providing public access on the internet through a host of websites owned and operated by the Defendants.

172. Defendants engaged in the deceptive advertising herein alleged with the intent to directly or indirectly sell the debit cards under the Unauthorized Programs described herein and/or to induce the public to enter into an obligation relating to the same.

173. Defendants' advertising was untrue or misleading and likely to deceive the public in that the debit cards under the Unauthorized Programs were not underwritten by the Bank, and were not in any way approved by the Bank.

174. In making and disseminating the statement(s) herein alleged, the Defendants knew, or by the exercise of reasonable care should have known, that the statement(s) was/were untrue or misleading and so acted in violation of *Business and Professions Code* § 17500.

175. As of today's date, the Bank has incurred $35,000 in fines from Visa based on the non-compliance of the Unauthorized Programs. The Bank is aware that it faces additional and further fines from Visa as a result of the Unauthorized

Programs in the amount of not less than $25,000 and potentially up to $1 million. In addition, the potential loss of its Visa program, which would expose the Bank to millions of dollars in exposure and cause substantial lost opportunities, causes damages to the Bank in an amount not less than $50 million. The Bank is aware of claims against it from Shoreline and First in an amount not less than $100,000. The Bank is subject to fines by the OCC in an amount not less than $1,175,000 per day, which could potentially exceed $105 million. If the Bank is stripped of its federal charter, its damages will exceed an amount not less than $200 million. The Bank has also been damaged by the Promoters' aforementioned acts in that the Bank has suffered losses due to the Promoters' conversion and embezzlement of funds and lost opportunities in the amount unknown at this time, but is, on information and belief, exceeding $10 million. The Bank has also incurred legal fees and expects to incur additional legal fees.

176. Unless immediately restrained by this court, the Defendants will continue to engage in untrue and misleading advertising, as alleged above, in violation of *Business and Professions Code* § 17500, thus rendering judgment in the instant action ineffectual. Further, the Bank has no adequate remedy at law in that Defendants will continue to engage in untrue and misleading advertising, as alleged above, in violation *Business and Professions Code* § 17500, thus engendering a multiplicity of judicial proceedings.

## NINTH CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage Against All

### Defendants)

177.   The Bank hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 176 above.

178.   The Bank currently has business relationships with existing Customers.  The Bank holds prospective economic relations with their customers and other prospective customers in the ordinary course of their business, including the sale of banking products with which Defendants are intentionally interfering.

179.   Defendants intentionally and wrongfully interfered with these relationships by, *inter alia*, intentionally taking actions – utilizing confidential and trade secret information misappropriated from Plaintiff and engaging in the dissemination of false information regarding the Plaintiff that negatively impacted Plaintiff's prospective economic relations.

180.   As a direct and proximate result of the aforementioned conduct, the Bank's relationships with Customers, prospective customers and other third parties have been and are being disrupted and damaged in an amount to be proven at the trial of this matter.

181.   The Promoters' aforementioned conduct consisted of intentional misrepresentations, deceit, and concealment of material facts known to the

54

1    Promoters with the intention of depriving the Bank of property or legal rights or

2    otherwise causing injury.  Further, the Promoters' conduct was despicable and

3
4    subjected the Bank to cruel and unjust hardship in conscious disregard of the

5    Bank's rights, so as to justify an award of exemplary and punitive damages.

6                        **TENTH CAUSE OF ACTION**

7
8    **(Breach of Fiduciary Duty Against Torres and Fukumoto and Does 100-125,**

9                                 **inclusive)**

10       182.  Plaintiff hereby incorporates by reference and realleges each and

11
12   every allegation set forth in paragraphs 1 through 181 above.

13       183.  Torres and Fukumoto were employees of the Bank.  As the Bank's

14   employee, Torres and Fukumoto were responsible for the operation of the

15
16   Unauthorized Program, including access to and responsibility for the proper

17   maintenance of the Bank Accounts associated therewith.

18       184.  By virtue of the employment of Torres and Fukumoto by the Bank,

19
20   Torres and Fukumoto each owed to the Bank a fiduciary duty, and by virtue of the

21   Bank's having placed confidence in the fidelity and integrity of them in entrusting

22   them with the authority to oversee the Bank Accounts in connection with the

23
24   Unauthorized Program, a confidential relationship existed at all times herein

25   mentioned between Torres and the Bank and between Fukumoto and the Bank.

26

27

28

185. Torres and Fukumoto breached their respective duties to the Bank by administering the Unauthorized Program to benefit themselves and the Promoters by, among other things, using the Bank Accounts for illegal purposes such as conversion, embezzlement, money laundering, commingling funds, tax evasion, debit card fraud, mail fraud, wire fraud, bank fraud and drug trafficking.

186. Torres also breached his fiduciary duty to the Bank by failing to disclose and actively concealing from the Bank that he had/has a direct interest in Primo. Fukumoto not only knew of Torres' interest, but he had an interest himself and failed to disclose these facts.

187. Torres breached his fiduciary duty to the Bank by misrepresenting to the community at large that the Bank was underwriting the Unauthorized Programs by sending marketing materials, solicitations and other communications to members of the financial community containing such statements.

188. Fukumoto breached his fiduciary duty to the Bank in that he was aware of the fact that Torres was in breach of his duties to the Bank, as alleged above, but did not disclose this information to the Bank.

189. As of today's date, the Bank has incurred $35,000 in fines from Visa based on the non-compliance of the Unauthorized Programs. The Bank is aware that it faces additional and further fines from Visa as a result of the Unauthorized Programs in the amount of not less than $25,000 and potentially up to $1 million.

In addition, the potential loss of its Visa program, which would expose the Bank to millions of dollars in exposure and cause substantial lost opportunities, causes damages to the Bank in an amount not less than $50 million. The Bank is aware of claims against it from Shoreline and First in an amount not less than $100,000. The Bank is subject to fines by the OCC in an amount not less than $1,175,000 per day, which could potentially exceed $105 million. If the Bank is stripped of its federal charter, its damages will exceed an amount not less than $200 million. The Bank has also been damaged by the Promoters' aforementioned acts in that the Bank has suffered losses due to the Promoters' conversion and embezzlement of funds and lost opportunities in the amount unknown at this time, but is, on information and belief, exceeding $10 million. The Bank has also incurred legal fees and expects to incur additional legal fees.

190.   The aforementioned conduct of Torres and Fukumoto consisted of intentional misrepresentations, deceit, and concealment of material facts known to Torres with the intention of depriving the Bank of property or legal rights or otherwise causing injury. Further, the conduct of Torres and Fukumoto was despicable and subjected the Bank to cruel and unjust hardship in conscious disregard of the Bank's rights, so as to justify an award of exemplary and punitive damages.

## ELEVENTH CAUSE OF ACTION

### (Conversion Against All Defendants)

191.   The Bank hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 190 above.

192.   As the Bank's employee, Fukumoto was responsible for conducting internal audits as an independent auditor for the Bank.  Fukumoto was specifically charged with detecting violations of policies and procedures and promptly reporting them to the Bank.  Torres was responsible for supervising the compliance program and had general daily oversight and gatekeeper function over all of the core functions at the Bank.  Torres was specifically charged with detecting violations of policies and procedures and promptly reporting them to the Bank.

193.   Beginning on or about December 4, 2006, Torres and Fukumoto continuously represented to the Bank that they would administer the Unauthorized Program in accordance with his duties and responsibilities as officers and fiduciaries of the Bank.   These representations were in fact false when made.  The truth was that the Defendants that they would convert substantial sums from the Bank and the Bank Accounts for the sole benefit of themselves and without the permission of the Bank.

194.   The Defendants absconded with an unknown amount of proceeds from the Bank Accounts.  The Defendants herein refuse to return any of these sums

to the Bank.

195.   The Defendants' aforementioned conduct consisted of fraud, intentional misrepresentations, deceit, and concealment of material facts known to the Promoters with the intention of depriving the Bank of property or legal rights or otherwise causing injury.  Further, the conduct of the Defendants' herein was despicable and subjected the Bank to cruel and unjust hardship in conscious disregard of the Bank's rights, so as to justify an award of exemplary and punitive damages.

## TWELFTH CAUSE OF ACTION

### (Embezzlement Against Torres, Fukumoto, Bazan,

### Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt,

### Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors,

### FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 126-150, inclusive)

196.   The Bank hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 195 above.

197.   As the Bank's employee, Fukumoto was responsible for conducting internal audits as an independent auditor for the Bank.  Fukumoto was specifically charged with detecting violations of policies and procedures and promptly reporting them to the Bank.  Torres was responsible for supervising the compliance program and had general daily oversight and gatekeeper function over all of the

core functions at the Bank. Torres was specifically charged with detecting

violations of policies and procedures and promptly reporting them to the Bank.

198.   Beginning on or about December 4, 2006, Torres and Fukumoto

continuously represented to the Bank that they would administer the Unauthorized

Program in accordance with his duties and responsibilities as officers and

fiduciaries of the Bank. These representations were in fact false when made. The

truth was that Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs.

Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF,

Evox, Victor Felice, Allied Wallet, Kwahaja and Does 101-125 planned that the

Defendants would embezzle substantial sums from the Bank and the Bank

Accounts for the sole benefit of themselves and without the permission of the

Bank.

199.   By virtue of their employment by the plaintiff, Torres and Fukumoto

each owed to the Bank a fiduciary duty, and by virtue of the Bank's having placed

with them confidence in the fidelity and integrity in entrusting them with the

authority to oversee the Bank Accounts in connection with the Primo Program, a

confidential relationship existed at all times herein mentioned between Torres and

the Bank and Fukumoto and the Bank. By virtue of Torres' unauthorized

delegation of duties, the fiduciary relationship extended to Bazan, Oscar Bazan,

Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid

Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 101-125.

200. Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 101-125 absconded with an unknown amount of proceeds from the Bank Accounts. The Defendants herein refuse to return any of these sums to the Bank.

201. The Defendants' herein aforementioned conduct consisted of fraud, intentional misrepresentations, deceit, and concealment of material facts known to the Promoters with the intention of depriving the Bank of property or legal rights or otherwise causing injury. Further, the conduct of the Defendants' herein was despicable and subjected the Bank to cruel and unjust hardship in conscious disregard of the Bank's rights, so as to justify an award of exemplary and punitive damages.

**THIRTEENTH CAUSE OF ACTION**

**(Conspiracy Against all Defendants)**

202. The Bank hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 201 above.

203. The Bank is informed and believes and thereon alleges that on or beginning in or about November 2006 through the present, the Core Conspirators and the Promoters knowingly and willfully entered into an agreement and

1  conspiracy to use defraud the Bank through the Unauthorized Programs.  The Core

2  Conspirators and the Promoters agreed to operate the Unauthorized Programs

3  according to terms and conditions concealed from the Bank, including the

4

5  implementation of mechanisms to mislead, deceive and defraud the Bank.

6      204.   The Promoters' aforementioned conduct consisted of fraud,

7  intentional misrepresentations, deceit, and concealment of material facts known to

8

9  the Promoters with the intention of depriving the Bank of property or legal rights

10  or otherwise causing injury.  Further, the Promoters' conduct was despicable and

11

12  subjected the Bank to cruel and unjust hardship in conscious disregard of the

13  Bank's rights, so as to justify an award of exemplary and punitive damages.

14      205.   The Bank suffered damages as a result of the conspiracy.

15

16                    **FOURTEENTH CAUSE OF ACTION**

17         **(Misappropriation of Trade Secrets Against All Defendants)**

18      206.   Plaintiff hereby incorporates by reference and realleges each and

19

20  every allegation set forth in paragraphs 1 through 205 above.

21      207.   By reason of the foregoing acts, Defendants have engaged in

22  misappropriation of trade secrets, without the Bank's express or implied consent,

23

24  in violation of California trade secret law.

25      208.    The Bank has highly valuable confidential information and trade

26  secrets, including but not limited to complex formulae to determine appropriate

27

28

financing terms, interest rates, pricing points, deal structures, and market valuations for potential and actual transactions within their narrow market segment. These trade secrets are (i) not generally known to the public, or to other persons, who could obtain economic value from their disclosure or use; (ii) derive independent economic value from not being so known , in that they have been generated over a long period of time through the expenditure of substantial money, expertise, and effort; and (iii) are the subject of reasonable efforts to maintain their secrecy as described at least partly above.

209. These trade secrets afford the Bank an essential competitive edge in the marketplace for providing Customers a prepaid debit card and are important to the continuing operation of Plaintiff's business.

210. Defendants gained access to the Bank's trade secrets pursuant to their business relationships with the Bank and/or the Promoters, and in particular with Torres, a Bank employee. Indeed, the Promoters, through Torres, implemented a software system at the Bank which allowed certain ISO Defendants access to Bank records. Further, the ISO Defendants utilized all such information obtained from the Promoters, and Torres in particular, to their own advantage.

211. Defendants breached their duty of confidentiality by using the Bank's Trade secrets, in the way described above, including but not limited to efforts to identify the most valuable Customers and sell the promotion in a manner

that would benefit the Defendants.

212.    Defendants conduct has caused, and unless enjoined will continue to cause, substantial injury and damages to the Bank.

213.    As a result of aforementioned conduct, the Bank has suffered damages and will imminently suffer further damages, including the loss of its trade secrets and competitive position.  Such damages cannot presently be ascertained with precision but will be evidenced at the trial of this matter.

## FIFTEENTH CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Relations

### Against All Defendants)

214.    Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 213 above.

215.    The Bank holds prospective economic relations with their current customers and other prospective customers in the ordinary course of their business, including the sale of banking products with which Defendants are intentionally interfering.

216.    Defendants wrongfully interfered with these relationships by, *inter alia*, utilizing confidential and trade secret information misappropriated from Plaintiff and engaging in the dissemination of false information regarding the Plaintiff that negatively impacted Plaintiff's prospective economic relations.

217.   As a direct and proximate result of the aforementioned conduct, the Bank's relationships with its Customers, prospective customers and other third parties have been and are being disrupted and damaged in an amount to be proven at the trial of this matter.

**SIXTEENTH CAUSE OF ACTION**

**(Imposition of Constructive Trust [for Embezzled Funds] Against Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 151-300)**

218.   Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 217 above.

219.   As described above, the Defendants herein misappropriated proceeds by means of false and fraudulent conversion and embezzlement. Further, the Defendants herein concealed their fraudulent scheme by a number of mechanisms designed to conceal from the Bank the activities. The misappropriation of the Bank's proceeds for the personal use by Defendants' herein occurred without the Bank's knowledge or consent.

220.   By virtue of the wrongful acts by the defendant herein, the converted funds are currently held, at least in part, in the Defendants' herein respective Bank Accounts.

## SEVENTEENTH CAUSE OF ACTION

### (Imposition of Constructive Trust [for Concealed Profits] Against All Defendants)

221.   Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 220 above.

222.   As described above, the Defendants misappropriated profits by means of false and fraudulent conversion and embezzlement.  Further, the Defendants herein concealed their fraudulent scheme by a number of mechanisms designed to conceal from the Bank the activities.  The misappropriation of the Bank's profits for the use by Defendants' herein occurred without the Bank's knowledge or consent.

223.   By virtue of the wrongful acts by the defendant herein, the converted funds are currently held, at least in part, in the Defendants' herein respective Bank Accounts.

## EIGHTEENTH CAUSE OF ACTION

### (An Accounting Against All Defendants)

224.   Plaintiff hereby incorporates by reference and realleges each and every allegation set forth in paragraphs 1 through 223 above.

225.   The Defendants refused, and continue to refuse, the Bank's request for information concerning the misappropriated funds.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

226.   The Bank is uncertain of the specific amount that the Defendants misappropriated for their own personal use and an accounting is necessary to determine this amount given the nature of the Defendants' fraudulent conduct inasmuch as they stole money from the Bank by, among other mechanisms, fraud, fraudulent misrepresentations and through fiduciaries at the Bank with unfettered access to the Bank's internal database.  Further, the Defendants herein concealed their untoward activities by secreting material information, business records and destroying critical electronic data on the Bank's computer systems in furtherance of their scheme to defraud the Bank.

227.   The amount of money due from the Defendants herein to the Bank pursuant to the Unauthorized Program is unknown to the Bank and cannot be ascertained without an accounting of the receipts and disbursements of the Unauthorized Program.

228.   The Bank demands that the Defendants herein account for the aforementioned Unauthorized Program and pay the amount found due to the Bank thereunder, but the Defendants' herein refuse to render the accounting and/or pay the Bank.

**PRAYER FOR RELIEF**

WHEREFORE, the Bank prays for judgment as follows:

ON THE FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

For an order that the Court declare that the Bank is not obligated in any way under the Unauthorized Programs established by the Promoters and the ISO Defendants; and

For an order that the Court declare that the Defendants have no right, title or interest in the Unauthorized Programs and that they must release all claims and further indemnify the Bank for any claims brought against it in connection with the Unauthorized Programs.


ON THE SECOND CAUSE OF ACTION AGAINST DEFENDANTS TORRES, FUKUMOTO, BAZAN, OSCAR BAZAN, FATEMI, MONTALVO, MRS. VAN OORDT, MR. VAN OORDT, PRIMO, CELEB, PREPAID, PREPAID DISTRIBUTORS, FTF, EVOX, VICTOR FELICE, ALLIED WALLET, KWAHAJA AND DOES 1-25

For an order that the Court award the Bank general damages, special damages, punitive and exemplary damages in an amount necessary to punish the Defendants, the maximum civil penalty, and attorneys' fees, in an amount according to proof at time of trial.

- 68 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ON THE THIRD CAUSE OF ACTION AGAINST DEFENDANTS

TORRES, FUKUMOTO, BAZAN, OSCAR BAZAN, FATEMI, MONTALVO,

MRS. VAN OORDT, MR. VAN OORDT, PRIMO, CELEB, PREPAID,

PREPAID DISTRIBUTORS, FTF, EVOX, VICTOR FELICE, ALLIED

WALLET, KWAHAJA AND DOES 26-50)

For an order that the Court award the Bank general damages, special damages, punitive damages in an amount necessary to punish the Defendants, the maximum civil penalty, and attorneys' fees, in an amount according to proof at time of trial.

ON THE FOURTH CAUSE OF ACTION AGAINST DEFENDANTS

TORRES, FUKUMOTO, BAZAN, OSCAR BAZAN, FATEMI, MONTALVO,

MRS. VAN OORDT, MR. VAN OORDT, PRIMO, CELEB, PREPAID,

PREPAID DISTRIBUTORS, FTF, EVOX, VICTOR FELICE, ALLIED

WALLET, KWAHAJA AND DOES 51-75)

For an order that the Court award the Bank general damages, special damages, punitive damages in an amount necessary to punish the Defendants, and attorneys' fees, in an amount according to proof at time of trial.

ON THE FIFTH CAUSE OF ACTION AGAINST DEFENDANTS

TORRES, FUKUMOTO, BAZAN, OSCAR BAZAN, FATEMI,

MONTALVO, MRS. VAN OORDT, MR. VAN OORDT, PRIMO,

CELEB, PREPAID, PREPAID DISTRIBUTORS, FTF, EVOX, VICTOR

FELICE, ALLIED WALLET, KWAHAJA AND DOES 76-100)

For an order that the Court award the Bank general damages, special

damages, punitive damages in an amount necessary to punish the

Defendants, and attorneys' fees, in an amount according to proof at time of

trial.


ON THE SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

For an order that the Court award the Bank general damages, special

damages, punitive damages in an amount necessary to punish the

Defendants, and attorneys' fees, in an amount according to proof at time of

trial.


ON THE SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

For an order that the Court award the Bank general damages, special

damages, punitive damages in an amount necessary to punish the

70

1  Defendants, attorneys' fees, in an amount according to proof at time of trial;

2  and

3

4      For an order that the Court enjoin all Defendants from engaging in any

5  unlawful, unfair or fraudulent business acts or practices and unfair, deceptive untrue

6  or misleading advertising within the meaning of Business and Professions Code §

7

8  17200 *et seq.*

9  <u>ON THE EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>

10      For an order that the Court award the Bank general damages, special

11

12  damages, punitive damages in an amount necessary to punish the

13  Defendants, attorneys' fees, in an amount according to proof at time of trial;

14  and

15

16      For an order that the Court enjoin all Defendants from engaging in any

17  unlawful, unfair or fraudulent business acts or practices and unfair, deceptive untrue

18  or misleading advertising within the meaning of Business and Professions Code §

19

20  17200 *et seq.*

21

22  <u>ON THE NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS</u>

23

24      For an order that the Court award the Bank general damages, special

25  damages, punitive damages in an amount necessary to punish the

26  Defendants, attorneys' fees, in an amount according to proof at time of trial.

27

28

## ON THE TENTH CAUSE OF ACTION

## AGAINST DEFENDANTS TORRES AND FUKUMOTO AND DOES

## 100-125, INCLUSIVE

For an order that the Court award the Bank general damages, special damages, punitive damages in an amount necessary to punish the Defendants, attorneys' fees, in an amount according to proof at time of trial.

## ON THE ELEVENTH CAUSE OF ACTION

## AGAINST ALL DEFENDANTS

For an order that the Court award the Bank general damages, special damages, punitive damages in an amount necessary to punish the Defendants, attorneys' fees, in an amount according to proof at time of trial.

## ON THE TWELFTH CAUSE OF ACTION AGAINST

## DEFENDANTS TORRES, FUKUMOTO, BAZAN, OSCAR

## BAZAN, FATEMI, MONTALVO, MRS. VAN OORDT, MR. VAN OORDT,

## PRIMO, CELEB, PREPAID, PREPAID DISTRIBUTORS, FTF, EVOX, VICTOR

## FELICE, ALLIED WALLET, KWAHAJA AND DOES 126-150)

For an order that the Court award the Bank general damages, special damages, punitive damages in an amount necessary to punish the Defendants, attorneys' fees, in an amount according to proof at time of trial.

## ON THE THIRTEENTH CAUSE OF ACTION

## AGAINST ALL DEFENDANTS

For an order that the Court award the Bank general damages, special damages, punitive damages in an amount necessary to punish the Defendants, attorneys' fees, in an amount according to proof at time of trial.

## ON THE FOURTEENTH CAUSE OF ACTION

## AGAINST ALL DEFENDANTS

For an order that the Court award the Bank general damages, special damages, punitive damages in an amount necessary to punish the Defendants, attorneys' fees, in an amount according to proof at time of trial.

ON THE FIFTEENTH CAUSE OF ACTION

AGAINST ALL DEFENDANTS

For an order that the Court award the Bank general damages, special damages, punitive damages in an amount necessary to punish the Defendants, attorneys' fees, in an amount according to proof at time of trial.

ON THE SIXTEENTH CAUSE OF ACTION AGAINST DEFENDANTS TORRES, FUKUMOTO, BAZAN, OSCAR BAZAN, FATEMI, MONTALVO, MRS. VAN OORDT, MR. VAN OORDT, PRIMO, CELEB, PREPAID, PREPAID DISTRIBUTORS, FTF, EVOX, VICTOR FELICE, ALLIED WALLET, KWAHAJA AND DOES 151-300)

For an order declaring that Defendants Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 151-200 hold the subject funds in trust for the Bank; and

For an order compelling Defendants Torres, Fukumoto, Bazan, Oscar Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 151-200 to return the subject funds to the Bank.

74

1    ON THE SEVENTEENTH CAUSE OF ACTION AGAINST DEFENDANTS

2    TORRES, FUKUMOTO, BAZAN, OSCAR BAZAN, FATEMI, MONTALVO,

3
     MRS. VAN OORDT, MR. VAN OORDT, PRIMO, CELEB, PREPAID,
4
5    PREPAID DISTRIBUTORS, FTF, EVOX, VICTOR FELICE, ALLIED

6    WALLET, KWAHAJA AND DOES 151-200

7
          For an order declaring that Defendants Torres, Fukumoto, Bazan, Oscar
8
9    Bazan, Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid,

10   Prepaid Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does

11
12   201-250 hold the subject funds in trust for the Bank; and

13        For an order compelling Defendants Torres, Fukumoto, Bazan, Oscar Bazan,

14   Fatemi, Montalvo, Mrs. Van Oordt, Mr. Van Oordt, Primo, Celeb, Prepaid, Prepaid
15
16   Distributors, FTF, Evox, Victor Felice, Allied Wallet, Kwahaja and Does 201-250

17   to return the subject funds to the Bank.

18
19
     ON THE EIGHTEENTH CAUSE OF ACTION AGAINST ALL
20
21   DEFENDANTS)

22        For an accounting between the Bank and Defendants; and

23
          For payment to the Bank in the amount due from the Defendants as a result of
24
25   the accounting, plus prejudgment interest.

26
27
28

<u>ON ALL CAUSES OF ACTION AGAINST ALL DEFENDANTS</u>

For an award against all Defendants for costs of suit, interest as provided by law and granting such other and further relief as this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

The Bank hereby demands a jury trial.

Dated: January 14, 2008          **LAW OFFICES OF BRANDON S. REIF**

By: _____

Brandon S. Reif
   Email: brandon@reifattorneys.com
Rebecca E. Forman
   Email: rebecca@reifattorneys.com
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel: 310.836.4800
Fax: 310.836.4801

Donald P. Hateley (SBN 168890)
   Email: dhateley@hateleyhampton.com
**HATELEY & HAMPTON, APC**
1800 Century Park East, Sixth Floor
Los Angeles, CA 90067
Telephone: 310.576.4758
Facsimile: 310.388.5899

Attorneys for Plaintiffs
TFC HOLDING COMPANY,
TOMATOBANK, N.A. and
TOMATO CARD SERVICES, INC.